# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CARRIE COSTANZO, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO,<br><br>Defendant. | Case No.: 1:25-cv-12716<br><br>**Jury Trial Demanded** |

## CLASS COMPLAINT

Plaintiff Carrie Costanzo ("Costanzo" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, Stowell & Friedman, Ltd., for her Complaint against the Defendant, City of Chicago, alleges as follows:

### INTRODUCTION

1. Through hard work, talent, and dedication in nearly a decade of work as a police officer, Plaintiff Carrie Costanzo has risen through the ranks of the Chicago Police Department ("CPD") to become a Sergeant.

2. But the CPD required Costanzo to work for several years under Lieutenant Godfrey Cronin, who sexually harassed and assaulted her. He called her "hot," "sexy," and "the horniest chick in the unit," including in public work settings, and pressured her to engage in sexual conduct with other police officers.

3. Despite the CPD's well-known "code of silence," under which CPD officers close ranks to protect wrongdoers on the force, Costanzo made the brave decision to file an internal

complaint register ("CR") against Cronin, risking retaliation and escalating discrimination and harassment.

4. A genuine investigation into these events would have vindicated Costanzo and brought her significant relief that only the Bureau of Internal Affairs ("BIA") could give her after an investigation, like ensuring that Cronin was disciplined, suspended, reassigned, or fired. Indeed, the BIA ultimately sustained some allegations in Costanzo's CR.

5. Costanzo also sought to vindicate her statutory rights to be free of stalking and of workplace discrimination. In October 2020, she filed a lawsuit seeking an order of protection against Cronin and in 2021, filed a charge of discrimination and retaliation with the Equal Opportunity Employment Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR").

6. Unbeknownst to her, however, the City maintained an unlawful policy of pausing internal investigations into alleged workplace misconduct when an employee also reported the same wrongdoing in a lawsuit or to a state or federal agency.

7. As a result of that policy, the City blocked Costanzo and countless others like her from obtaining any of the relief that only an internal investigation could give her, like ensuring that perpetrators of discrimination, harassment, and retaliation like Cronin were suspended, fired, or removed from the complainant's chain of command.

8. Thus, because of that policy, the City ensured that Cronin and other discriminators and harassers like him could retain his post, and complainants like Costanzo would have to transfer to avoid their supervision.

9. Cronin, meanwhile, was permitted to retire with full pension benefits while the internal investigations against him languished.

10. Only after Costanzo was forced to file a federal complaint to vindicate her rights did the City finally conclude its investigation, finding nearly four years after the investigation began that Cronin indeed had sexually harassed Costanzo. Adding insult to injury, the City ordered Cronin suspended without pay—years after he retired.

11. The City's policy of suspending internal investigations when an employee exercises her constitutional rights to report misconduct in court and to state and federal agencies violates its officers' rights under the First Amendment, as incorporated through the Fourteenth Amendment, and has caused significant harm to Costanzo.

12. Costanzo's story is but one example of the significant harm that the City's unlawful policy imposes on its brave police officers who dare to exercise their rights. Costanzo and the class she seeks to represent bring this action to reform that policy to ensure that what happened to Plaintiff does not happen to other sworn female officers.

## JURISDICTION AND VENUE

13. Plaintiff's claims arise under 42 U.S.C. § 1983. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

14. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). Both Plaintiff and Defendant are residents of this District, and the unlawful conduct alleged in this Complaint occurred in this District.

## PARTIES

15. Defendant City of Chicago ("City" or "Defendant") is a municipal corporation organized and existing under the laws of the State of Illinois. Among its operating departments is the Chicago Police Department ("CPD").

16. Plaintiff Carrie Costanzo ("Costanzo"), a resident and citizen of Illinois, is female and is currently employed as a Sergeant by the City of Chicago Police Department ("CPD").

3

## FACTUAL ALLEGATIONS

**Cronin Discriminated Against and Sexually Harassed Costanzo**

17. Costanzo began her employment with the CPD as a police officer in approximately February 2015 and has remained a devoted and successful officer. Costanzo has received numerous recognitions and commendations throughout her tenure, including nine Honorable Mention Certificates, an award for officers who have demonstrated outstanding performance above and beyond that required of assignment, multiple Complimentary Letters, a Crime Reduction Award, a Lifesaving Award, a Unit Meritorious Performance Award, and six Emblems of Recognition for Physical Fitness. She has earned a promotion to Sergeant.

18. Upon joining the CPD, Costanzo was assigned to the 2nd District/Wentworth. Due to her outstanding performance, in approximately March 2018, Costanzo was detailed to a specialized unit, the Area Central Bicycle Patrol Unit, covering the Loop and the downtown area.

19. In approximately September 2018, Costanzo attended an off-duty social gathering of police officers hosted by Lieutenant Godfrey Cronin ("Cronin"). At this time, Costanzo did not know Cronin, nor had she ever met him. Shortly after Costanzo arrived at the party, Cronin approached Costanzo and asked her, "Whose hot girlfriend are you?" or words to that effect. Later, Cronin approached Costanzo and another female police officer and told them that they were the "hottest chicks here" and instructed them to collect money from "the boys" for the charity raffle. After the raffle winner was selected, without any warning, Cronin attempted to put his hand into Costanzo's front pants pocket and give her money. Costanzo left the party shortly thereafter because of how uncomfortable Cronin made her feel.

20. In approximately May 2020, CPD assigned Lt. Cronin to be the commanding officer of Costanzo's unit. Shortly after taking command of Costanzo's unit, Cronin commented

to Costanzo that he recognized her, remarking, "You were the hot chick" at the party, or words to that effect.

21. Upon Cronin becoming Costanzo's supervisor, Cronin routinely made sexually charged and harassing comments about Costanzo's personal appearance in her presence and the presence of other officers, including comments such as, "Well, aren't you just the sexiest/hottest girl in the unit?" Cronin referred to Costanzo as, "hot," "sexy," "broad," "chick," "sexiest," and "hottest," among others. Cronin's constant sexual comments about Costanzo's appearance caused Costanzo to avoid Cronin when possible.

22. Cronin's harassing and demeaning statements about Costanzo were frequently made in the presence of Costanzo's fellow officers. Mimicking the sexually hostile environment Cronin was creating and following his lead, Costanzo's fellow officers teased and harassed Costanzo as well. The hostile environment Cronin created significantly impaired Costanzo's ability to do her important job and communicate with her colleagues effectively.

23. Cronin's harassment of Costanzo escalated from sexist remarks, to openly humiliating her and sexualizing her in front of her peers. For example, one morning approximately 100 CPD officers, including Costanzo's unit, had breakfast at a restaurant in the Loop. During the meal, Cronin shouted at Costanzo that he had a man he wanted to "hook her up with." Humiliated and embarrassed, Costanzo hid in the bathroom in the hopes that Cronin would cease his harassment; however, when Costanzo finally exited the bathroom, Cronin was waiting for her, along with the male officer he was trying to "hook her up with," blocking her exit and trapping her in the restaurant. Cronin told Costanzo that she and the male police officer should "hook up and exchange numbers." Cronin then grabbed Costanzo's phone from her breast pocket and took a photo of the male officer with her phone so that Costanzo would not "forget

5

his handsome face." After, Costanzo fled the restaurant to find a private place and cried because of the shame and humiliation Cronin caused her in front of so many of her peers.

24. After the incident in the restaurant, Cronin continued to make sexual and sexist comments to and about Costanzo in the presence of Costanzo's peers, causing her embarrassment, humiliation, and emotional distress. Costanzo's peers continued to tease and harass her about Cronin's comments and conduct, making it difficult for Costanzo to effectively perform her job.

25. Cronin's sexual harassment continued and escalated following the incident in the restaurant. For example, during roll call with the entire unit of approximately 120 officers present, Cronin grabbed Costanzo's arm to make her stand before the entire unit, and tightly held Costanzo around her neck against him so that she could not move, as he declared that Costanzo was the "horniest chick in the unit." When Costanzo demurred, Cronin doubled down and demanded that she "name a hornier chick in the room." Costanzo experienced extreme panic, being physically held against her will and humiliated before her peers and colleagues. Following this incident, Costanzo's fellow officers teased her and laughed at her.

26. After the incident at roll call, Costanzo complained to Cronin about his conduct and expressed how badly it made her feel and how demeaning it was. Cronin ignored Costanzo's remarks and refused to acknowledge her feelings or concerns.

27. Cronin's persistent and escalating sexual harassment caused Costanzo severe emotional distress, including panic attacks, anxiety, and bouts of crying.

28. After the roll call incident, Costanzo met with her sergeant and complained about Cronin's humiliating sexual comments during roll call and the ongoing and pervasive hostile work environment and sexual harassment Cronin had subjected her to since he became her supervisor. The sergeant referred her to another sergeant, who dissuaded Costanzo from filing a

6

formal CR against Cronin, claiming this issue would be better handled "in-house." Rather, the sergeant suggested he set up a meeting with himself, Cronin and Costanzo so Cronin could apologize—in other words, raise her complaints to a meeting in which the subject of her complaint was the highest-ranking officer in the room. Costanzo felt pressured to agree to this "in-house" option and reluctantly agreed. However, before the sergeant could set up such a meeting, Costanzo's mental health deteriorated further, and Costanzo suffered severe anxiety and apprehension at the thought of facing Cronin.

29. However, even on protected medical leave, Cronin continued to harass Costanzo. While Cronin was at a restaurant with friends, the waiter informed Costanzo that her bill was paid for by "the lieutenant." Costanzo then saw Cronin, in his police uniform, outside the restaurant, with the clear implication that he felt emboldened to follow her and intrude into her private life and protected leave with impunity.

30. Cronin's intrusion into Costanzo's private life caused her to fear for her safety and to have a panic attack so severe that she was hospitalized. Costanzo required further medical treatment, including out-patient and in-patient mental health treatment for stress, anxiety, PTSD, among other things.

**Costanzo Opened Complaint Registers Against Cronin That Were Not Resolved for Over Four Years Because She Also Sought Relief from a Court and State and Federal Agencies**

31. Ultimately, several days after the roll call incident, in August 2020, Costanzo opened a formal CR against Cronin. And following the incident at the restaurant on her medical leave, Costanzo opened another CR.

32. Initially, the Bureau of Internal Affairs ("BIA") purported to investigate in earnest. The BIA interviewed several witnesses in August and September 2020, including Costanzo and Cronin.

33. But after several weeks passed without tangible results from the CRs, and having to continue experiencing the stress and fear of either working under Cronin or Cronin continuing to stalk and harass her in her personal life, in October 2020, Costanzo was forced to file a complaint for an order of protection against Cronin.

34. At that point, unbeknownst to Costanzo, pursuant to the City's unlawful custom, practice, or policy of freezing investigations when the complainant also files a lawsuit, the City refused to complete its investigation until her suit against Cronin was concluded.

35. Costanzo was able to obtain an *ex parte* Emergency Stalking/No Contact Order against Cronin, which required the court to find that Cronin "engag[ed] in a course of conduct directed at [Costanzo]," where he knew or should have known "that [his] course of conduct would cause a reasonable person to fear for his or her safety or the safety of a third person or suffer emotional distress." 740 ILCS 21/10.

36. The full lawsuit against Cronin, however, took approximately a year to resolve. During that time, the BIA failed to interview Cronin or otherwise seriously investigate. Only after Costanzo's lawsuit was disposed of in August 2021 did the BIA resume its investigation in earnest, interviewing Cronin in September 2021 after his exposure in the lawsuit was resolved.

37. In June 2021, having still received no relief from her internal complaints, Costanzo also sought relief from state and federal agencies by filing a charge of discrimination with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights.

38. The EEOC, as the City knows, often takes months or even years to investigate or otherwise resolve charges. The EEOC publicly represents that "[o]n average, we take approximately 10 months to investigate a charge."[1]

39. In Costanzo's case, the matter remained pending before the EEOC for over three years.

40. The City spurred this delay in part because in July 2021 it filed a position statement with the EEOC responding to Costanzo's charge, in which it represented to the EEOC that "CPD's Bureau of Internal Affairs ('BIA') initiat[ed] an investigation into the hostile work environment allegations, which is ongoing." The City further represented that after receiving her EEOC charge, the BIA "incorporated her allegations" in her charge "into its investigation of the two open CRs."

41. Indeed, several times throughout its response, the City assured the EEOC that "CPD's BIA is currently investigating the remaining allegations in this paragraph" and that the City would "amend its response once the investigation is complete."

42. Given the EEOC's heavy docket and understaffing, and with the assurance that the City was investigating the allegations itself, the EEOC allowed Costanzo's charge to remain pending for several years.

43. For example, as the City knows is common in EEOC investigations, the EEOC did not serve Costanzo with the City's position statement for many months, and Costanzo was not able to provide the EEOC with a response to the City's position statement until August of 2023.

---

[1] EEOC, *What You Can Expect After You File a Charge*, https://www.eeoc.gov/what-you-can-expect-after-you-file-charge (last accessed July 11, 2025).

9

44. The EEOC then spent months determining whether the matter could be mediated in advance of a complete investigation before determining that the investigation would proceed.

45. The EEOC did not interview Costanzo until February of 2024, nearly three years after Costanzo originally filed her charge, and continued to request information to investigate the charge well into 2024.

46. The EEOC ultimately did not issue its notice of right to sue until August 2024, over three years after Costanzo filed her charge, explaining after over three years that it would "not proceed further with its investigation and makes no determination about whether further investigation would establish violations of [Title VII]."

47. Thus, over three years after seeking relief with the EEOC and the BIA, no one had provided any relief to Costanzo or even fully investigated the misconduct she alleged.

48. Costanzo was forced to file a federal lawsuit to vindicate her rights, and sued the city for violations of Title VII of the Civil Rights Act in November 2024. *Costanzo v. City of Chicago*, No. 24-11313, Dkt. 1 (N.D. Ill. Nov. 1, 2024).

49. By that time, as alleged in the Complaint, the BIA still had not completed its investigation into Cronin's and others' misconduct against Costanzo. (*Id.* ¶¶ 29, 34.)

50. But to Costanzo's surprise, ten days after she had to publicly file a lawsuit to vindicate her rights, the BIA finally concluded its "investigation" into the CRs she opened in 2020.

51. In November 2024, now that its failure to investigate had become a potential liability, the BIA finally sustained Costanzo's allegation of sexual harassment based on the August 2020 incident in which Cronin called her "the horniest chick in the unit" and physically grabbed her, which he did in front of scores of witnesses, as a violation of several departmental rules. The BIA recommended that Cronin be suspended for 7 days.

10

52. But because the BIA investigation had been paused for so long pursuant to its custom, policy, or practice, the recommended penalty against Cronin was completely without effect—Cronin had long ago been permitted to retire as a Lieutenant notwithstanding the still-pending open investigations by the BIA.

53. Cronin retired in or around 2022 without any form of discipline or punishment related to Costanzo's CRs.

54. And while Costanzo's ultimately-sustained CR was pending, the City told Costanzo that the only way she could keep her spot on a prestigious detail was by continuing to report to Cronin, which Costanzo could not tolerate. Costanzo therefore had to transfer to a less prestigious position to get away from him.

***The City's Policy of Freezing Internal Investigations Because an Employee Also Petitions State or Federal Agencies for Redress Violates Employees' Constitutional Rights and Causes Substantial Harm***

55. During the litigation of her federal lawsuit, Costanzo learned that the timing of the BIA's investigation was no accident—she discovered that the City has a custom, policy, or practice of pausing internal investigations of misconduct when an officer also reports the same or similar misconduct in a lawsuit or to state and federal equal employment agencies.

56. Ordinarily, the City would promptly investigate an internal report of misconduct.

57. But under the City's custom, policy, or practice, the City refuses to investigate, or at a minimum refuses to conclude investigations, into the same misconduct in instances where the complainant has also exercised her First Amendment right to speak on matters of public interest—by reporting unlawful practices—and petitioning courts or state or federal agencies for redress.

11

58. The custom, policy, or practice of pausing investigations does not serve any governmental interest, either. The City already recognizes that internal investigations and external investigations are not duplicative of one another and can proceed simultaneously.

59. Indeed, the City's internal disciplinary investigations and the EEOC and IDHR's investigations and remedial schemes serve different purposes. Courts, the EEOC, and the IDHR are not vested with authority to mete out internal discipline, including suspensions or terminations, to offending officers. The BIA, on the other hand, was empowered to recommend suspensions for sexual harassers like Cronin—indeed, it did recommend suspending him, years after he retired.

60. The City's custom, policy, or practice of shutting down internal investigations in retaliation for an employee's exercise of her protected Free Speech and Petition rights, thereby deprives employees who exercise their First Amendment rights of the type of redress that they can only achieve internally.

61. Therefore, the City's custom, policy, or practice of refusing to pursue and complete its internal investigation in retaliation for Costanzo's exercise of her protected Free Speech and Petition rights directly caused harm to Costanzo and those similarly situated to her by permitting Cronin and similar accused perpetrators of discrimination, harassment, and retaliation, to continue to harass employees and maintain hostile work environments without penalty or even rebuke until investigations at the EEOC concluded.

62. The City's custom, policy, or practice of unlawful retaliation caused Costanzo and those similarly situated to her to suffer significant financial losses and irreparably damaged her career. The City's unlawful discrimination and retaliation further caused Costanzo emotional distress and other non-pecuniary losses.

## CLASS ALLEGATIONS

12

63. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of **employees of the Chicago Police Department who from September 19, 2023 to present had a Complaint Register ("CR") pending with the Bureau of Internal Affairs and had also filed at least one of the following raising allegations related to the CR: (i) a lawsuit in a state or federal court; (ii) a charge of discrimination with the Illinois Department of Human Rights; or (iii) a charge of discrimination with the Equal Employment Opportunity Commission.**

64. All requirements of class certification are met by the proposed class.

65. The class of CPD employees and former employees who filed both CRs and charges or lawsuits is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

66. There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

67. The claims alleged by Plaintiff are typical of the claims of the class members. Fed. R. Civ. P. 23(a)(3).

68. Plaintiff will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

69. The issues of determining liability and equitable relief, among other issues, are appropriate for issue certification under Rule 23(c)(4), as are other common issues.

70. The proposed class also meets the requirements for certification under Rule 23(b)(2) and Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior

to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

## COUNT I

### VIOLATION OF FIRST AMENDMENT RIGHTS TO SPEECH AND PETITION IN VIOLATION OF 42 U.S.C § 1983

71. The First Amendment of the U.S. Constitution, as incorporated through the Fourteenth Amendment, prohibits "abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amd. I; *see also* U.S. Const. amd. XIV.

72. Costanzo, and those similarly situated to her, spoke as private citizens when they made statements concerning discrimination, harassment, hostile work environment, and retaliation at the Chicago Police Department in lawsuits against and in a charge filed with the EEOC and IDHR.

73. Costanzo, and those similarly situated to her, spoke on matters of public concern when they made statements concerning discrimination, harassment, hostile work environment, and retaliation at the Chicago Police Department in lawsuits and in charges filed with the EEOC and IDHR.

74. The City intentionally maintained a custom, policy, or practice of suspending internal investigations into misconduct in retaliation for Costanzo, and those similarly situated to her, reporting the same or similar misconduct in court or to state or federal agencies like the EEOC and IDHR.

75. By delaying and depriving employees of the chance to benefit from remedies that can be achieved only through internal investigations, the City's unlawful custom, policy, or

practice would be likely to deter an ordinary employee in Costanzo's circumstances from engaging in similar speech.

76. By the acts and conduct alleged above, Defendant has harmed Costanzo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, and all those similarly situated, request the entry of judgment in their favor and against Defendant as follows:

a. Certify this case as a class action and certify a class of **employees of the Chicago Police Department who from September 19, 2023 to present had a Complaint Register ("CR") pending with the Bureau of Internal Affairs and had also filed at least one of the following raising allegations related to the CR: (i) a lawsuit in a state or federal court; (ii) a charge of discrimination with the Illinois Department of Human Rights; or (iii) a charge of discrimination with the Equal Employment Opportunity Commission**;

b. Designate Plaintiff as Class Representative and designate Plaintiff's counsel of record as Class Counsel;

c. Declare that the acts and conduct of Defendant are unlawful and violate 42 U.S.C. § 1983;

d. Enjoin Defendant from enforcing or perpetuating its custom, policy, or practice of pausing internal investigations of misconduct when an officer also reports the same or similar misconduct in a lawsuit or to state and federal equal employment agencies.

e. Award Plaintiff, and all others similarly situated, the value of all compensation and benefits lost as a result of Defendant's unlawful conduct;

f. Award Plaintiff, and all others similarly situated, the value of all compensation and benefits they will lose in the future as a result of Defendant's unlawful conduct;

g. Award Plaintiff, and all others similarly situated, compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

h. Award Plaintiff, and all others similarly situated, prejudgment interest;

i. Award Plaintiff, and all others similarly situated, attorneys fees, costs, and disbursements; and

j. Award Plaintiff, and all others similarly situated, such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, and all others similarly situated, demands trial by jury on all issues so triable.

Respectfully submitted on behalf of Plaintiff and all others similarly situated,

STOWELL & FRIEDMAN LTD.

By: /s/ Linda D. Friedman

Linda D. Friedman

Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN, LTD.
303 W. Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888
lfriedman@sfltd.com
sbish@sfltd.com
grobot@sfltd.com